IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 24-CR-0251-RMR-05

UNITED STATES OF AMERICA,

      Plaintiff,

v.

5.    ROBERT O'SULLIVAN,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Anna Edgar, Assistant United States Attorney for the District of Colorado, and the defendant, Robert O'Sullivan, personally and by counsel, Joseph Saint-Veltri, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.    AGREEMENT

### A. Defendant's Plea of Guilty

The defendant agrees:

(1)    to plead guilty to Count 2 of the Indictment, charging a violation of 18 U.S.C. § 371, conspiracy to violate 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 220(a)(2)(A);

(2)    to waive certain appellate and collateral attack rights, as explained in detail below;

**COURT EXHIBIT 1**

(3)    to be liable for restitution, as detailed below; and

(4)    to admit forfeiture and to cooperate in all forfeiture matters, as more fully
described below.

**B. Government's Obligations**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B).

The government agrees not to bring other charges against the defendant based

on information currently known to the United States Attorney's Office for the District of

Colorado.

The government agrees to recommend a sentence at the bottom of the guideline

range as finally calculated by the Court.

The parties agree that the Defendant may request, pursuant to 18 U.S.C

§ 3553(a), a sentence below the U.S. Sentencing Guidelines range ultimately

determined by the Court or recommended by the government. The government

reserves the right to oppose such a request and to present argument and evidence

against the variance and in favor of its sentencing recommendation.

Provided the defendant does not engage in prohibited conduct or otherwise

implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4, between the guilty plea and

sentencing in this case, the government agrees that the defendant should receive a

two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and

agrees to file a motion requesting that the defendant receive a one-level reduction for

acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).

### C. Defendant's Waiver of Appeal

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

    (1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 371;

    (2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court);

    (3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria applies, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

    (1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied during the district court revocation proceedings. In that event, this waiver does not apply, and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A), where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### D. Restitution and Forfeiture

The defendant agrees that 18 U.S.C. § 3663A applies and acknowledges that a restitution order is mandatory. The total restitution amount associated with the conspiracy charged in Count 2 is $49,461,562.12, consisting of $1,378,039.22 paid to Tesis laboratories by Colorado Medicaid and $48,083,522.90 paid to Tesis laboratories by Medicare. The defendant stipulates that none of the tests for which Tesis submitted

claims to health care programs were medically necessary, and the full amount identified by the government ($49,461,562.12) is recoverable as restitution. The defendant's position is that the Court should apportion restitution pursuant to 18 U.S.C. § 3664(h), and he reserves the right to argue at sentencing that he should be responsible only for a portion of the $49,461,562.12 restitution owed for Count 2 because of his minority ownership share of Tesis and the lesser amount of money he received from Tesis. The Government's position is that the defendant should be ordered to pay the full amount of restitution, jointly and severally with any convicted co-conspirators, whether in this case or other cases, in the District of Colorado or in other districts.

The defendant admits the forfeiture allegations in the Indictment. The defendant further agrees to forfeit to the United States at sentencing any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 982(a)(7) and 981(a)(1)(C), and 28 U.S.C. § 2461(c), any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include but are not limited to: entry of a forfeiture money judgment in the amount of **$483,602.95**. The defendant agrees that $483,602.95 is the total value of the gross proceeds traceable to his offenses of conviction. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.

The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him/her if notice is not sent within the prescribed time frames.

The defendant further agrees to cooperate and assist the government in the forfeiture of the above-identified assets, including providing information on any third-party claims and providing testimony in any related third-party ancillary proceeding. The defendant's assistance shall include identification of property available to satisfy the forfeiture money judgment, and the transfer of such property to the United States upon request of the government by delivery of any necessary and appropriate documentation, including consents to forfeiture and quit claim deeds. The defendant agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rule of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. Notwithstanding the foregoing, the United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from forfeiture be remitted or restored to eligible victims of the offenses, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's

Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

The defendant shall provide the government and the Probation Office with a full, complete, and accurate personal financial statement. Specifically, the defendant agrees that within ten calendar days of the signing of this agreement, the defendant shall submit a completed Financial Disclosure Statement and shall fully disclose and identify all assets in which he has any interest and/or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or third party, whether located within or outside of the United States. The defendant agrees to provide, in a timely manner, all financial information requested by the government and, upon request, to meet remotely or in person to identify assets/monies which can be used to satisfy a forfeiture or restitution judgment. If the defendant deliberately provides incomplete or untruthful statements in his personal financial statement, this action shall be deemed a material breach of this Agreement and the government shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges otherwise set forth in this Agreement.

### E. Effect of Vacatur

Should the defendant's plea of guilty be vacated for any reason on motion of the defendant, the government may, in its sole discretion, file any charges against the defendant that were within the statute of limitations on the date of the defendant's plea

of guilty. The defendant expressly agrees that the statute of limitations for any such

counts is tolled from the date of his guilty plea until the date the plea is vacated.

## II.  ELEMENTS OF THE OFFENSES

The parties agree that the elements of the charged offenses are as follows:

Conspiracy, 18 U.S.C. § 371

1.  The defendant agreed with at least on other person to violate the law.

2.  One of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

3.  The defendant knew the essential objective of the conspiracy.

4.  The defendant knowingly and voluntarily participated.

5.  There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Tenth Cir. Pattern J.I. § 2.19.

Offering and Paying Kickbacks and Bribes, 42 U.S.C. § 1320a-7b(b)(2)(A)

1.  The defendant or a co-conspirator offered or paid any remuneration (including kickbacks and bribes), directly or indirectly, overtly or covertly, to a person.

2.  The remuneration or offer of remuneration was made to induce the person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service paid for, in whole or in part, by a Federal health care program, which, in this case, is Medicare and Colorado Medicaid.

3.  The defendant acted knowingly and willfully.

42 U.S.C. § 1320a-7b(b)(2)(A); see also United States v. Patel, 9:19-cr-80181 (S.D. Fla.). Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina (2020 Online Edition).

Eliminating Kickbacks in Recovery Act (EKRA), 18 U.S.C. § 220

1.  The defendant offered or paid any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind.

2. The defendant offered or paid the remuneration to induce a referral of an individual to a laboratory for services performed by the laboratory.

3. The defendant acted knowingly and willfully.

4. The services for which the referrals were made were covered by a health care benefit program, in or affecting interstate commerce.

18 U.S.C. § 220(a)(2)(A).

## III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 2 of the Indictment is: not more than five years of imprisonment; not more than three years of supervised release; a fine of not more than the greater of $250,000 or twice the gross gain or loss pursuant to 18 U.S.C. § 3571(d); a $100 mandatory victim's fund assessment fee; restitution; and forfeiture.

## IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury. The defendant understands and acknowledges that, as a result of his conviction, he will be excluded as a provider from Medicare, Medicaid, and all Federal health care programs.

## V.    STIPULATION OF FACTS

The following statement is a summary made for the purposes of providing the Court with a factual basis for the guilty plea and does not include all of the facts known to the parties concerning the criminal activity in which the defendant and others engaged.

Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below that are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts that are relevant to the Court's guideline computation, the 18 U.S.C. § 3553 factors, the parties' arguments in support of their sentencing positions, or to the Court's overall sentencing decision.

The defendant stipulates and agrees to the allegations set forth in the Indictment with respect to Count 2, and the parties stipulate that the following facts are true and correct.

Beginning in or around December 2019 and continuing through at least December 2022, in the State and District of Colorado and elsewhere, the defendant knowingly and willfully conspired and agreed with Ronald King, Victor Roiter, Tina Wellman, John Gautereaux, Adam Shorr, and Bradley Edson to offer and pay illegal health care kickbacks and bribes, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 220(a)(2)(A), to individuals and entities identified as "marketers" in exchange for the referral of beneficiaries and genetic testing orders to the Tesis laboratories— Claro Scientific Laboratories, Inc. ("Claro"), Alliance DX, LLC ("Alliance"), and 303 Diagnostics LLC.

The defendant was a founding member and owner of Tesis Labs LLC, later known as Tesis Biosciences LLC ("Tesis"), through his membership in Quant BPO LLC. The defendant owned and controlled FAM Enterprises, LLC, which was a member in Quant BPO LLC. When the co-conspirators established Tesis in late 2019, Quant BPO held 10% of the shares of Tesis, and the defendant, through FAM Enterprises, held a one-third share of Quant BPO. In or around April 2021, while remaining an owner of the company, the defendant was hired as an employee of Tesis and paid a salary to work with marketers and on "business development."

The defendant and his co-conspirators, through Tesis, operated four genetic testing laboratories: Claro Scientific Laboratories, Inc. (Claro), Alliance DX LLC (Alliance), 303 Diagnostics LLC, and Tesis Labs of Arizona LLC. Claro, Alliance, and 303 Diagnostics filed claims for reimbursement with and received payment from Medicare, Colorado Medicaid, commercial health insurers, and others. Claro and 303 Diagnostics were both located in Colorado.

Tesis, through employees of Billing Company, created test "panels" that it held out as pertaining to specific types of medical conditions, such as cardiac conditions or cancer. Each panel purported to test for a list of genes. Health care programs, including Medicare and Colorado Medicaid, would reimburse thousands of dollars per "panel" based on the billing codes the laboratories submitted on their claims.

To generate testing revenue, the Tesis laboratories paid "marketers" to solicit Federal health care program beneficiaries directly to participate in genetic testing, to procure doctors' orders from providers for genetic tests, and to refer beneficiaries with

the doctors' orders for genetic tests to the laboratories.

Before establishing Tesis and purchasing the Tesis laboratories, the co-conspirators participated in a "proof of concept" exercise through the entity Autumn Partnership LLC beginning in or around October 2019. The defendant was an owner of Autumn Partnership. The Autumn Partnership participants—King, Roiter, Wellman Gautereaux, Edson, and Shorr—agreed to purchase genetic testing "leads" from a marketing group that operated a call center and to sell those leads to a genetic testing laboratory in exchange for kickbacks, with the goal of demonstrating that operating a genetic testing laboratory based on this model would be profitable. "Leads" were genetic testing requisition forms signed by physicians for a beneficiary who had been recruited to participate in genetic testing through the call center. The laboratory that purchased the Autumn Partnership referrals was one of Wellman's Billing Company clients.

Autumn Partnership and the laboratory calculated a "flat fee" that could be paid to Autumn Partnership to conceal the fact that payment was based illegally on the volume and value of the referrals Autumn Partnership would sell to the laboratory. Specifically, the parties agreed that Autumn Partnership would be paid a certain percentage of the expected Medicare reimbursement for genetic testing based on a specific number of referrals to be provided per month. The defendant was included in the communications regarding the "flat fee" calculation methodology. For example, on October 3, 2019, in an e-mail Gautereaux forwarded to the defendant and King, the laboratory owner set forth a calculation of 45% of expected Medicare revenues based on a specific number of "accepted" referrals, resulting in a flat fee. The laboratory owner

explained that if more samples were provided per month than the number the flat fee

calculation was based upon, the parties would conceal an increased payment by falsely

saying that Autumn Partnership had "increased or decreased time, effort and resources

to our Partnership and will increase or decrease the monthly flat rate to reflect that."

The defendant knew this payment model—based on the volume and value of the

referrals a "marketing" company makes to a laboratory—was illegal based on a

communication he received on December 22, 2019. On that date, Gautereaux

forwarded the defendant and their co-conspirators an "exemplar doc" of a Certified

Public Accountant (CPA) letter that the laboratory owner asked Autumn Partnership to

have a CPA issue and sign for purposes of Autumn Partnership's dealings with the

laboratory. The attached exemplar letter explained that "under state and federal

healthcare laws any flat fee charged must result from the parties' arms-length

negotiations, that do *not* take into account any volume or value of referrals or business

otherwise generated between the parties . . . ." (Emphasis in letter). The exemplar

called for a CPA to calculate a "weekly fair value compensation range" and state that it

had reached this calculation based on consideration of factors regarding the value and

cost of the "marketing" company's business including: a "detailed evaluation" of the

management team; the objectives and relevant time frame for the services to be

performed; the "specific skills and unique qualifications" the company would provide,

including business expertise, leadership experience, knowledge of the healthcare

industry and reputation; the time requirements associated with the provision of services;

the reasonable profit margin the company should expect to realize; and expenses

incurred. These factors were purported to be the basis for the "flat fee" payment, but
Autumn Partnership never engaged in this exercise. When the defendant and his co-
conspirators ran Tesis, they continued to pay marketers based on the volume and value
of the referrals the marketing companies provided to the Tesis laboratories each month.
The defendant knew this was unlawful.

Once the Autumn Partnership participants demonstrated that they could
purchase "leads" from marketers on a per-beneficiary or per-test basis, and the
laboratory could make a substantial profit based on what it would receive in payment
from Medicare, the co-conspirators were able to purchase a laboratory in Colorado,
Claro, and begin Tesis's operations. Thus, through the Autumn Partnership "proof of
concept," the co-conspirators established the business model for Tesis: the purchase of
genetic testing referrals through kickbacks and bribes paid to "marketing" groups to
enable billing to and payment from Medicare and other health care programs.

At Tesis, the defendant and his co-conspirators agreed with marketers to pay
them based on the number and type of referrals (e.g., cancer genetic testing, cardiac
genetic testing, pharmacogenomic testing) the marketers would sell to the laboratories
each month. The Tesis laboratories submitted claims to Medicare, Colorado Medicaid,
and commercial insurers based on these referrals. Tesis offered the marketers payment
per "accepted" referral; for example, the Tesis laboratories typically paid between $1200
and $1500 for a cancer genetic testing (CGx) referral.  Marketers typically had a "quota"
for the number of accepted referrals the marketers were expected to provide each
month.

The co-conspirators used sham contracts between the Tesis laboratories and marketers to conceal the nature and source of the kickbacks and bribes, including by describing the payment structure as a "flat fee" for purportedly legitimate "marketing and business services" that the co-conspirators did not intend for the marketers to perform and that the marketers did not perform. The parties calculated the "flat fee" based on the number and type of referrals the marketer committed to provide each month. For example, if Tesis agreed to pay $1200 per CGx test, and a marketer committed to provide 100 CGx tests per month, the contract would identify a "flat fee" payment of $120,000 per month. The defendant worked with marketers to negotiate per-test payments from the Tesis laboratories to the marketers and caused the execution of sham contracts to conceal these kickbacks and bribes. The co-conspirators sometimes discussed the flat rate as based on "fair market value," but this phrase always referred to the volume and value of referrals the marketer would provide. In other words, the "fair market value" phrase was code used to conceal the unlawful nature of the payments. The defendant was aware that his co-conspirators engaged in the same process to negotiate payments with marketers on a per-referral basis and to conceal the volume and value of the payments in sham contracts. The co-conspirators operated this business model with the common goal of maximizing revenue to benefit themselves as owners of Tesis.

Tesis and Billing Company employees, including employees located in Colorado, tracked the number and type of referrals each marketing company sold to the Tesis laboratories and whether the referrals were "accepted" or "rejected" and should be

"corrected." Test requisitions were "accepted" only if they identified a minimum number
of diagnosis codes (ICD-10 codes), such that the Billing Company believed the Tesis
laboratories would be paid a sufficient amount for the testing. Medicare and Colorado
Medicaid paid claims for genetic testing only if the claims identified diagnosis codes
(ICD-10 codes) that were facially related to the specific medical procedures or tests
identified on the claims. To manufacture facial justification for the claims, the co-
conspirators caused marketers that worked with Tesis to participate in "medical
necessity" training, during which marketers were instructed which diagnosis codes were
required to appear on doctors' orders for each test requisition in order for the
laboratories to "accept" the sample.

Requisitions that did not identify enough "valid" ICD-10 codes were rejected, and
marketers were notified that these requisitions should be "corrected." The Billing
Company, under Wellman's direction, reviewed each referral sold to the Tesis
laboratories for "medical necessity"—that is, the number and type of diagnosis codes
listed on the requisition forms. They referred to this process as "scrubbing." The
defendant reviewed scrubbing reports that identified the total number of referrals the
marketing companies submitted, the accepted or rejected status for each requisition,
and whether "medical necessity" were met based on the Billing Company's review of the
number and type of ICD-10 codes included. The defendant and his co-conspirators
shared the numbers and type of referrals each marketer sent in, and the accepted or
rejected status, with the marketers to allow marketers to submit "corrections" and to
ensure marketers met their monthly referral numbers.

The defendant participated in using the number of "accepted" samples for marketers each month to determine the amount and timing of payment and the marketers' contract status. If a marketer failed to hit their monthly quota, the marketer's payment would be skipped or delayed, or their contract would be terminated. For example, in April 2021, the defendant e-mailed with Wellman, King, Roiter, and other Tesis employees about a marketer who had "50 [samples] a month" but had only provided "32 accepted samples." The defendant stated that he agreed "100% in this specific situation that based on any of the numbers the payment should not be made" to the marketer because he had not hit his quota. Contracts would also be terminated and new contracts written with a different Tesis laboratory to adjust the "flat rate" downward to reflect a marketers' underperformance based on promised quotas. When a marketer overproduced, exceeding their monthly quota, marketers could receive a new contract with a Tesis laboratory with whom they had not yet contracted to conceal additional payments for volume and value above the contracted flat rate.

The defendant's actions and participation in the conspiracy caused the payment of illegal kickbacks and bribes to marketing companies by the Tesis laboratories. This included payment for referrals sent to the Colorado laboratories—Claro and 303 Diagnostics.

The co-conspirators shared a common goal to make Tesis as profitable as possible so they could either take the company public or sell it to investors, enabling the "buy out" of the original Tesis owners at a substantial profit. To this end, the defendant participated in attempting to maximize the number of "samples" sent to Tesis each

month, as well as attempting to obtain outside funding (through "factoring" or loans) to pay operational costs to allow the business to continue to grow.

The defendant admits that he committed, or that others committed and he was witness to or a participant in, the following overt acts identified in the Indictment, and that these overt acts were intended to and did further the conspiracy:

1. On or about June 16, 2020, King e-mailed Roiter, Shorr, Wellman, O'Sullivan, Gautereaux, and Edson, stating, "Just as a follow up to our discussion earlier, we put together a projection by July 15th to have the following volume delivered into the Lab based on flat rate contracts," followed by a table listing marketers and "Volume" for each. (Indictment, ¶ 73). The numbers listed in the e-mail for each marketer identified the number of referrals each marketer was to provide and the provided the basis for the calculation of the "flat fee" in their contracts.

2. On or about September 1, 2020, as reflected in minutes of an executive meeting involving King, Wellman, Roiter, Shorr, the defendant, Edson, Gautereaux, and another, King reported that "Everyone hit their marketing quote for the month by the third week." King also requested of the group to "Please ensure that all contracts are in place before payment is made so that we ensure compliance during audits." (Indictment ¶ 76).

3. On or about November 19, 2020, the defendant texted King, "Am I reading this right that if he [marketer] delivers, his company will receive $8mm in payments?" King responded, "If he delivers. So 800k for you." (Indictment ¶ 82).

This text exchange refers to the defendant's negotiations with a marketing company; the defendant obtained from the marketer the number of referrals he expected to be able to provide per month, and the "flat fee" was calculated based on the anticipated volume. The "if he delivers" comment is a reference to the volume of referrals the marketer was supposed to provide per month to be paid. If the marketer did not "deliver," he would not be paid. The defendant arranged with certain marketers he recruited or attempted to recruit to work with Tesis for them to pay him an "override" or commission on the payments the marketer was to receive from Tesis. This was also an unlawful kickback.

4.      On or about January 19, 2021, King texted the defendant regarding a marketer and stated, "He's not understanding the main point which is he's not driving volume in yet. We need to move him to a TX agreement. Just cancel the claro agreement is my suggestion." The defendant responded, "…[H]e should be good volume so he should be willing to cancel and then restart with a realistic volume with that group[.] That resets the number…." (Indictment ¶ 83). The defendant's statement regarding "resetting the number" referred to the marketer's quota of referrals under a new contract. Because the marketer was not sending enough referrals under the contract it had with Claro, King's suggestion was to produce a new contract with Alliance for a lesser volume and lower payment.

5.      On or about May 19, 2021, the defendant forwarded to King a marketer agreement and e-mail describing the agreement as "based on the 35 samples/month with an even split between Cardio & PGx" and requested King's

review. (Indictment ¶ 86).

6.      On or about August 5, 2021, King spoke with the defendant on the

phone and advised him regarding communications with marketers regarding

volume. King told the defendant to tell a marketer not to "put anything in writing

anymore based on volume," but that the defendant could bring the contractor on,

and they would "just basically back into it." King further stated:

> I saw your email on, uh, bringing [marketer] onboard. The only reason I
> didn't respond to it is [the marketer] put in there specifically volumes,
> which is a compliance issue, he can't refer that way to discussion points.
> That's the reason why I didn't respond to the e-mail, because it would then
> acknowledge that we understood he's talking about price for volume. So,
> anytime someone does that and they e-mail you and say, "Hey I have 20
> of this or 100 of that or 50 of that and you know, can I get 1200 per
> sample'" or whatever it is, just don't even respond to it on e-mail. Don't
> even acknowledge it, just pick up the phone and call them and say, you
> know, you cannot put any of those things in writing . . . .

(Indictment ¶ 90). Also during this call, King told the defendant that he was going

to direct a Tesis IT employee to "purge" the e-mail from the marketer from the

Tesis e-mail system.

7.      On or about August 5, 2021, during the conversation referenced

above, King told the defendant that King would authorize a contract for the

marketer for $700,000 per year based on 85 referrals per month at $700 each, or

$59,500 per month, equivalent to $714,000 per year, "and then we'll just plus or

minus him based on how he does on a month-to-month basis." (Indictment ¶ 91).

8.      On or about May 9, 2022, the defendant texted with Roiter about a

kickback payment to a marketer. The defendant asked if Roiter had "[a]ny idea

what the payment to [marketer] will be tomorrow?" Roiter responded, "Who said it

will be tomorrow? I did not see the scrubbing report / Was the scrubbing report

sent over?" and continued that, "I will be able to tell you what the payment should

be after I see the report." ROITER communicated that based on "14 samples for

March and April. All PGX 500x14 = 7,000." When the defendant asked if he

should relay that information to the marketer, Roiter responded, "You can, just

call him don't put anything in writing." (Indictment ¶ 98).

As demonstrated through the facts alleged in the Indictment for Count 2,

the overt acts set forth therein, and the stipulated facts in this Plea Agreement, the

defendant and his co-conspirators were interdependent with respect to the conspiracy

charged in Count 2.

In addition to working with marketers for the Tesis laboratories, the defendant

also worked on a project for Tesis to establish its own "call center" to make direct

contact with beneficiaries to induce them to participate in genetic testing. The defendant

reviewed "scripts" for the call center representatives to follow when speaking to target

beneficiaries. The scripts included false statements intended to induce the beneficiaries

to agree to genetic testing, including, for example, the statement that genetic testing

"could replace blood test for heart failure and could be used to monitor heart failure.

Early diagnosis of a heart attack may now be possible by doing this test." The

defendant, with King and Wellman, set up a call center space in New York, hired a call

center employee to make calls, and attempted to generate revenue through direct

beneficiary inducement to genetic testing. The Tesis in-house call center project

ultimately was not successful.

The conspiracy charged in Count 2 resulted in payments from Medicare and Colorado Medicaid to the Tesis laboratories totaling $49,461,562.12, consisting of $1,378,039.22 paid to Tesis laboratories by Colorado Medicaid and $48,083,522.90 paid to Tesis laboratories by Medicare.

The defendant received payments of $483,602.95 as part of the conspiracy as an owner and employee of Tesis.

The defendant acknowledges and stipulates that the genetic tests ordered, completed, and paid for by the health care programs, including Medicare and Colorado Medicaid, were not medically necessary and were submitted in violation of Medicare and Colorado Medicaid rules and regulations, as set forth in the Indictment.

After the criminal investigation of Tesis and its principals became overt, the defendant continued to work to make money through Tesis and its operations. In or around April 2024, the defendant also agreed to be the "interim CEO" of Tesis.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. To aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

a) Under § 2X1.1 (conspiracy) the application guideline is that for the substantive offense, plus any adjustments for such guideline. The substantive offenses at issue are violation of the Anti-Kickback Statute and the Eliminating Kickbacks in Recovery Act.[1] These offenses group under § 3D1.2(d).

b) The applicable guideline is § 2B4.1. The base offense level is 8. Twenty-two offense levels are added because the value of the improper benefit conferred is more than $25 million and less than $65 million. *Id.* §§ 2B4.1(b)(1)(B); 2B1.1(b)(1)(L).

c) The defendant should receive a two-level deduction pursuant to § 4C1.1.

d) Defendant reserves the right to argue at sentencing that that he should receive an offense-level decrease of two levels for being a "minor participant" pursuant to U.S.S.G. § 3B1.2(b), on the basis that the loss amount "greatly exceeds the defendant's personal gain" as stated in Application Note 3(A) to § 3B1.2(b). It is the government's position that the mitigating role decrease does not apply, and the government reserves the right to make argument and present evidence to support its position at sentencing.

e) The defendant should receive a two-level deduction for acceptance of responsibility, *id.* § 3E1.1(a), and should the defendant comply with the terms of the plea agreement regarding acceptance of responsibility, an additional one-point deduction for timely notification of his intention to plead guilty, *id.* § 3E1.1(b).

---

[1] A conviction on a count charging a conspiracy to commit more than one offense is treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit. U.S.S.G. § 1B1.2(d).

f)      The resulting adjusted offense level without the "minor participant" adjustment is **25**. If the "minor participant" adjustment applies, the resulting adjusted offense level is **23**.

g)      The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties believe the defendant is in criminal history category I.

h)      The career offender/criminal livelihood/armed career criminal adjustments do not apply.

i)      The resulting advisory guideline range with an offense level 25 is **57 to 60 months** (the statutorily authorized maximum sentence). *Id.* § 5G1.1(c)(1). The resulting advisory guideline range with an offense level 23 is **46 to 57 months**.

j)      Pursuant to § 5E1.1, the Court must enter a restitution order. The parties' positions regarding restitution are set forth above.

k)      Pursuant to § 5E1.2, assuming the estimated offense levels above are correct, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

l)      Pursuant to § 5D1.2(a)(2), if the Court imposes a term of supervised release, that term is at least one year but not more than 3 years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no

other promises, agreements or "side agreements," terms, conditions, understandings, or

assurances, express or implied. In entering this agreement, neither the government nor

the defendant has relied, or is relying, on any other terms, promises, conditions, or

assurances.

Date: 3/11/25

_____
Robert O'Sullivan
Defendant

Date: 3/2 25

_____
Joseph Saint-Veltri
Attorney for Defendant

Date: 3/14/25

_____
Anna Edgar
Assistant U.S. Attorney